# EXHIBIT A

**UNITED STATES OF AMERICA**
Before the
**SECURITIES AND EXCHANGE COMMISSION**

**SECURITIES ACT OF 1933**
Release No. 9181 / February 3, 2011

**INVESTMENT ADVISERS ACT OF 1940**
Release No. 3149 / February 3, 2011

**INVESTMENT COMPANY ACT OF 1940**
Release No. 29574 / February 3, 2011

ADMINISTRATIVE PROCEEDING
File No. 3-14224

| | |
|---|---|
| **In the Matter of**<br><br>AXA ROSENBERG GROUP LLC, AXA ROSENBERG INVESTMENT MANAGEMENT LLC, and BARR ROSENBERG RESEARCH CENTER LLC,<br><br>**Respondents.** | CORRECTED ORDER INSTITUTING ADMINISTRATIVE AND CEASE-AND-DESIST PROCEEDINGS, PURSUANT TO SECTION 8A OF THE SECURITIES ACT OF 1933, SECTION 9(b) OF THE INVESTMENT COMPANY ACT OF 1940, AND SECTIONS 203(e), 203(f), AND 203(k) OF THE INVESTMENT ADVISERS ACT OF 1940, MAKING FINDINGS, AND IMPOSING REMEDIAL SANCTIONS AND A CEASE-AND-DESIST ORDER |

**I.**

The Securities and Exchange Commission ("Commission") deems it appropriate and in the public interest that public administrative and cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 8A of the Securities Act of 1933 ("Securities Act"), Section 9(b) of the Investment Company Act of 1940 ("Investment Company Act"), and Sections 203(e), 203(f), and 203(k) of the Investment Advisers Act of 1940 ("Advisers Act") against AXA Rosenberg Group LLC ("ARG"), AXA Rosenberg Investment Management LLC ("ARIM"), and Barr Rosenberg Research Center LLC ("BRRC") (collectively, "Respondents").

## II.

In anticipation of the institution of these proceedings, Respondents have submitted Offers of Settlement (the "Offers") which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over them and the subject matter of these proceedings, which are admitted, Respondents consent to the entry of this Order Instituting Administrative and Cease-and-Desist Proceedings, Pursuant to Section 8A of the Securities Act of 1933, Section 9(b) of the Investment Company Act of 1940, and Sections 203(e), 203(f), and 203(k) of the Investment Advisers Act of 1940, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order ("Order"), as set forth below.

## III.

On the basis of this Order and Respondents' Offers, the Commission finds[1] that:

### Overview

1.     This case involves an institutional money manager specialized in quantitative investment strategies that concealed from investors a material error in its computer code in violation of the federal securities laws.  ARG is the holding company of two SEC-registered investment advisers:  BRRC, which developed the code for the quantitative investment model (the "Model"), and ARIM, the institutional money manager that used the Model to manage client portfolios.  Senior management at ARG and BRRC failed to disclose the error for months after it was discovered in June 2009 and as a result ARG, BRRC and ARIM provided investors inaccurate information about the Model's performance and capabilities.  This error adversely impacted 608 of 1421 client portfolios managed by ARG and caused $216,806,864 in losses.

2.     In late June 2009, a BRRC employee discovered an error in the Model's computer code that was introduced in 2007 and effectively eliminated one of the key components in the Model for managing risk.  This employee later discussed his finding in a meeting with senior ARG and BRRC officials and employees.  A senior ARG and BRRC official ("Senior Official") directed them to keep quiet about the error and to not inform others about it, and he directed that the error not be fixed at that time.  While the error was eventually fixed for U.S. managed portfolios in September 2009 and for other portfolios in late October and early November 2009, BRRC employees followed the Senior Official's directive not to disclose the error until November 2009, when a BRRC employee felt compelled to inform ARG's CEO.  Following this, ARG conducted an

---

[1]     The findings herein are made pursuant to Respondents' Offers of Settlement and are not binding on any other person or entity in this or any other proceeding.

internal investigation, which it concluded in mid-March 2010, and obtained advice of external legal counsel concerning its obligation to disclose the error. In late-March 2010, ARG disclosed the error to Commission examination staff after Commission examination staff informed ARG of an impending examination of ARIM and BRRC. ARG disclosed the error to clients on April 15, 2010.

3. Before and after discovery of the error, ARIM's clients were voicing substantial concerns about the underperformance of their portfolios. In particular, clients were expressing dissatisfaction with their portfolios' industry overexposure, an element partly controlled by the Model's ability to manage risk. Because the Senior Official and others concealed the error for several months, the Respondents failed to disclose the error when responding to the client concerns. In fact, in presentations and other communications to clients and consultants after discovery of the error, the Respondents misrepresented the Model's ability to control risk and ascribed underperformance to market volatility and factors having nothing to do with the error. In addition, from the time the error was introduced, BRRC's compliance program and procedures were not adequately tailored to the particular risks of the firm, and to the extent there were procedures, they were not adhered to.

4. By virtue of this conduct, ARG willfully[2] violated Sections 17(a)(2) and 17(a)(3) of the Securities Act; ARIM willfully violated Section 206(2) of the Advisers Act; and BRRC willfully violated Sections 206(2) and 206(4) and Rule 206(4)-7 thereunder of the Advisers Act.

**Respondents**

5. AXA Rosenberg Group LLC is a holding company formed in 1998. ARG owns and governs ARIM, BRRC, and other offshore investment advisers ("Affiliated Advisers"). ARG is not registered with the Commission in any capacity.

6. AXA Rosenberg Investment Management LLC is an institutional money manager and investment adviser registered with the Commission based in Orinda, California. It is the investment adviser for U.S. clients.

7. Barr Rosenberg Research Center LLC is an investment adviser registered with the Commission based in Orinda, California, that develops and maintains the Model.

**Background**

8. ARIM and BRRC pioneered the use of quantitative techniques – embodied in BRRC's Model – to implement investment strategies. The Model was comprehensive in its ability to capture and process a substantial amount of publicly available

---

[2] A willful violation of the securities laws means merely "'that the person charged with the duty knows what he is doing.'" Wonsover v. SEC, 205 F.3d 408, 414 (D.C. Cir. 2000) (quoting Hughes v. SEC, 174 F.2d 969, 977 (D.C. Cir. 1949)). There is no requirement that the actor "'also be aware that he is violating one of the Rules or Acts.'" Id. (quoting Gearhart & Otis, Inc. v. SEC, 348 F.2d 798, 803 (D.C. Cir. 1965)).

information, such as financial data for particular companies, news, and industry information, and to make investment decisions largely without human interaction. The Model consisted of three components: the Alpha Model, Risk Model, and Optimizer. The Alpha Model evaluates public companies based on their earnings and valuation. The Risk Model identifies risk on two primary bases – specific stock risk and common factor risks. Common factor risks include, among other things: (i) specific industry risks, which are risks associated with certain industries (such as oil, automobiles, or airlines); (ii) country risks, which are risks associated with particular countries; and (iii) stock fundamental risks, which capture price to earnings ratios and similar metrics. The Optimizer takes the output from the Alpha and Risk Models, balances them against each other, and recommends an optimal portfolio for the client based on a benchmark chosen by the client, such as the S&P 500.

9. BRRC's clients are ARIM and the Affiliated Advisers, which use the Model as their exclusive investment decision-making tool and market the Model, relying on information provided by BRRC, as the basis of their offer of investment advisory services to prospective clients. Within BRRC, an informal but undisclosed "micro group" consisting largely of a small group of long-time and trusted BRRC employees, none of whom had any compliance-related responsibilities, was primarily responsible for the Model. The micro group was led by the Senior Official and only its members had full access to the Model and all of its underlying code.

### Discovery and Concealment of the Error

10. In April 2007, BRRC put into production a new version of the Risk Model. BRRC had assigned the task of writing the computer code that would link this new Risk Model with the Optimizer primarily to two programmers. Although BRRC tested the new Risk Model, it did not conduct independent quality control over the programmers' work on the code. When these two programmers linked the Risk Model to the Optimizer, they made an error in the Optimizer's computer code. Although BRRC conducted simulations involving the new Risk Model before rolling it out, these simulations did not detect the error. As a result, BRRC did not detect the symptoms of the error and did not discover the error itself until testing another new version of the Risk Model.

11. Starting in 2009, a BRRC employee began work as part of BRRC's effort to implement a new version of the Risk Model. In June 2009, this employee noticed certain unexpected results when comparing the new Risk Model to the existing one that was rolled out in April 2007. He learned that the Optimizer was not reading the Risk Model's assessment of common factor risks correctly because an error in the code caused a failure to perform the required scaling of information received from the Risk Model. Some Risk Model components sent information to the Optimizer in decimals while other components reported information in percentages; therefore the Optimizer had to convert the decimal information to percentages in order to effectively consider all the information on an equal footing. Because proper scaling did not occur, the Optimizer did not give the intended weight to common factor risks.

12. In late June 2009, this BRRC employee informed the Senior Official and other BRRC employees of the error and presented his findings to them in a meeting. The employee emailed another senior BRRC employee following this meeting, detailing his discovery of the error and proposing that the error be fixed immediately.

13. The Senior Official and other BRRC employees met around the end of June 2009 to further discuss the error. The BRRC employee who discovered the error advocated that the error be fixed immediately. The Senior Official, however, disagreed and stated that the error should be corrected when the new Risk Model would be implemented. The Senior Official directed BRRC employees with knowledge of the error to keep quiet about the discovery of the error and to not inform others about it. The BRRC employee who discovered the error asked the Senior Official whether ARG's Global Chief Investment Officer ("CIO") should be informed, and the Senior Official instructed that he should not be told.

14. From at least the beginning of 2009, another team located in London (the "U.K. Group") that reported to ARG's Global CIO had begun to examine and test the Model, based on substantial concerns expressed by some of ARIM's and the Affiliated Advisers' clients about their portfolios' underperformance due to industry overexposure, an element partly controlled by the Model's ability to assess common factor risks. As they tested the Model, the U.K. Group discussed their research and findings with the BRRC employee who discovered the error. By August 2009, as the U.K. Group began to hone in on the error, the Senior Official's instruction to keep quiet about the error became increasingly problematic. Ultimately, in early September 2009, certain BRRC employees with knowledge of the error admitted to the U.K. Group that the error existed. By September 2009, certain of the Respondents' senior officers knew about the error, but still failed to disclose the error to ARG's Global CEO or clients.

15. On September 24, 2009, Respondents' Investment Committee met to discuss certain changes to the Risk Model, which included a proposed change to the common factor risk component. Although the proposed change was intended to fix the error, certain members of the Investment Committee were not informed that there was an error or that this change was in fact meant to correct the error. The Investment Committee authorized the change to the Risk Model.

16. The Senior Official omitted to disclose the error to ARG's Board. In mid-to-late 2009, ARG convened a series of Board meetings to discuss the Model's performance. Many of the meetings addressed client complaints about underperformance and industry overexposure. The Senior Official and others who knew about the error attended the meetings and participated in these discussions. In early October 2009, the Board had a discussion about the Model and its performance. At one point, a director asked a question relating to the Model's underperformance. The Senior Official replied that "mistakes if there were any will not be made in the future" and that he was "not aware of significant" mistakes in the Model.

17. In late November 2009, a BRRC employee informed ARG's Global CEO that there was an error in the code of the Model that effectively eliminated common

5

factor risks and that the error had already been corrected. ARG initiated an internal investigation in late December 2009 and obtained advice of external legal counsel concerning Respondents' obligations to disclose the error. ARG's internal investigation concluded in mid-March 2010.

18. ARG disclosed the error to the Commission staff after the Commission examination staff informed ARIM and BRRC that they would begin an examination of the firms on March 23, 2010. ARG convened a series of Board meetings beginning on March 26. On March 31, 2010, Commission examination staff arrived at ARIM's and BRRC's offices to begin their exam. At the end of that day, ARG informed the Commission staff of the error. On April 15, 2010, ARG informed clients of the error.

### Misrepresentations and Omissions

19. After discovery of the error in June 2009, the Respondents made material misrepresentations and omissions concerning the error to ARIM's clients, including (i) omitting to disclose the error and its impact on client performance, (ii) attributing the Model's underperformance to market volatility rather than the error, and (iii) misrepresenting the Model's ability to control risks. For example, in July 2009, the Respondents misrepresented to a client that the Model's underperformance was attributable to market volatility rather than, in part, to the error, and in August 2009, the Respondents misrepresented to a mutual fund sub-advisory client that the Risk Model's common factor risks were functioning when in fact they had been disabled due to the error.

20. The Respondents also made misrepresentations and omissions about the scope and application of their compliance policies and procedures, particularly as to BRRC, both before and after the discovery of the error. For example, the Respondents misrepresented to clients that internal controls processes and procedures covered BRRC when in fact certain of these controls, such as the internal audit program, were not implemented. Moreover, although the Respondents represented that the Investment Committee reviewed and approved changes to the Model, the Investment Committee rarely convened.

### Policies and Procedures

21. Policies and procedures referenced in Respondents' Compliance Manual required that the error be disclosed and escalated to senior ARG management, including ARG's Global CEO, Global CIO, and General Counsel.

22. ARG's Code of Ethics, which applied to ARIM and BRRC, provides:

> The Firm [defined in the Code of Ethics to include, among other entities, ARIM, BRRC, and the Affiliated Advisers] is committed to conducting its business according to a high standard of honesty and fairness. This commitment to observing a high ethical standard is designed not only to ensure compliance with applicable laws and regulations in the jurisdictions

where AXA Rosenberg Group operates, but also to earn and keep the trust of its clients, shareholders, personnel, and business partners.

It is the policy of the Firm to conduct its business in accordance with best international practice, and always strictly within the laws of the countries in which it operates, in a manner that manages conflicts of interest appropriately and seeks to avoid even any appearance of conflict of interest. These practices are essential for maintaining the reputation, the client confidence, and the regulatory licenses upon which the business of the Firm depends. Employees are expected to observe a high standard of business and personal ethics and to exercise proper judgment in conducting the Firm's business.

23. The "AXA Rosenberg Group LLC Incident and Issue Escalation Policy" (the "Escalation Policy"), which was also applicable to ARIM and BRRC, was designed "to establish operating procedures and guidelines for the timely escalation of incidents and issues which raise potential and/or actual significant risks to the operations or reputation of the firm" in order "to avoid, minimize, or otherwise mitigate any negative financial, regulatory, legal or reputational impact of such incidents and issues on the firm." This policy required that any breakdown of "Risk Management and Internal Controls" or "failure in compliance procedures (including violations of regulatory requirements, breaches of client mandates/investment guidelines, or any other compliance requirement)" that resulted in an actual loss of $25,000 or potential loss of $100,000 be reported to ARG's Global CEO, Global CIO, or General Counsel. Also, any "regulatory or legislative breach or similar incident that has, or could potentially, result in a formal investigation or disciplinary sanctions by local regulators, government and industry bodies and could therefore result in fines or a rise in regulatory scrutiny" or any matter which "potentially could have an adverse impact on the public reputation of AXA Rosenberg" must also be reported to these senior managers.

24. In not disclosing and escalating the error to senior management, the Senior Official and other BRRC employees did not comply with these policies and procedures.

## Violations

### ARG's Violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act

25. As a result of the conduct described above, ARG violated Sections 17(a)(2) and 17(a)(3) of the Securities Act. Section 17(a)(2) of the Securities Act specifically prohibits any untrue statements of material fact or material omissions in the offer or sale of securities. Section 17(a)(3) of the Securities Act prohibits engaging in a course of business which operates as a fraud or deceit in the offer or sale of securities.[3]

---

[3] Establishing violations of Sections 17(a)(2) and 17(a)(3) does not require a showing of scienter; negligence is sufficient. Aaron v. SEC, 446 U.S. 680 (1980); SEC v. Hughes Capital Corp., 124 F.3d 449, 453-54 (3d Cir. 1997).

7

26. ARG violated Sections 17(a)(2) and 17(a)(3) of the Securities Act by making material misrepresentations and omissions about the Model. Specifically, ARG misrepresented and omitted to disclose to investors the existence of a material error in the Model and the Model's ability to account for risk. ARG misrepresented that common factor risks were accounted for in the Model when in fact, due to the undisclosed error, common factor risks were disabled. These facts would have been important to clients because they indicated that a key component of the Risk Model was not working and would have, in part, explained underperformance in certain accounts and other concerns those clients had been voicing for some time.

27. ARG also misrepresented the compliance and control procedures in effect at BRRC. ARG misrepresented to investors that all internal controls processes and procedures that applied to BRRC were implemented. A reasonable investor would consider these facts important when deciding to engage ARIM as an adviser because BRRC maintained the Model that directed all securities transactions at ARIM, and an investor clearly would have had concerns about the Model knowing that certain controls and checks were not in place to monitor BRRC.

## ARIM and BRRC's Violations of Section 206(2) of the Advisers Act

28. As a result of the conduct described above, ARIM and BRRC willfully violated Section 206(2) of the Advisers Act. This section prohibits any investment adviser from engaging in any transaction, practice or course of business which operates as a fraud or deceit upon any client or prospective client. Pursuant to Section 206(2), investment advisers have a fiduciary duty that requires them to act in the best interests of their clients and to make full and fair disclosure of all material facts.

29. By concealing and delaying to fix the error, BRRC and ARIM breached their fiduciary duty to their clients. During the relevant period, clients were expressing concerns about their overexposure to certain industries and underperformance, both of which were in part attributable to the error. Although the Senior Official and others were aware of these concerns, they did not disclose the error. This failure to disclose extended to certain client presentations, in which ARIM and BRRC personnel misrepresented that the underperformance was attributable to factors other than the error and inaccurately stated that the Risk Model's common factor risks were functioning when in fact they had been disabled due to the error. In addition, the Senior Official's failure to fix the error allowed it to remain uncorrected for several additional months. Because BRRC and ARIM failed to disclose the error, certain clients continued to sustain losses from an error that could have been but was not promptly corrected.

30. BRRC also failed to conduct any meaningful materiality analysis of the error's impact. BRRC knew that its clients used the Model to manage their clients' portfolios, and that the error could potentially have adverse effects on the performance of portfolios managed using the Model. Yet, BRRC only performed rudimentary and limited analyses to estimate the error's impact.

### BRRC's Violations of Section 206(4) of the Advisers Act and Rule 206(4)-7 Thereunder

31.     As a result of the conduct described above, BRRC also willfully violated Advisers Act Section 206(4) and Rule 206(4)-7 thereunder.  Rule 206(4)-7 requires investment advisers to "[a]dopt and implement written policies and procedures reasonably designed to prevent violation" of the Advisers Act and the rules thereunder by their supervised persons.  The Commission has stated that an adviser's failure "to have adequate compliance policies and procedures in place will constitute a violation of our rules independent of any other securities law violation."  Compliance Programs of Investment Companies and Investment Advisers, Advisers Act Rel. No. 2204, 68 F.R. 74714, 74715 (Dec. 24, 2003) ("Compliance Release").  The Compliance Release also states that "[e]ach adviser, in designing its policies and procedures, should first identify conflicts and other compliance factors creating risk exposure for the firm and its clients in light of the firm's particular operations, and then design policies and procedures that address those risks."  68 F.R. at 74716.

32.     BRRC was not subject to fundamental compliance procedures and controls.  BRRC violated Rule 206(4)-7 by failing to adopt and implement policies and procedures reasonably designed to ensure that it did not make false and misleading statements and/or omissions to clients and investors, including failing to ensure that the Model performed as represented, in violation of the antifraud provisions in the Advisers Act.  BRRC claimed that its Model would, among other things, assess common factor risks.  Yet, BRRC did not have reasonable procedures in place to ensure that the Model would assess those risk factors as intended.  Similar to many quantitative investment advisers, BRRC utilizes a complex computer program to implement its strategies.  For the Risk Model rolled out in April 2007, ARG failed to conduct sufficient quality control over the coding process before putting that model into production.  The coding process itself represented a serious risk exposure for BRRC and its clients because accurate coding is required for the Model to function properly and as represented to clients.  Because BRRC's compliance program did not sufficiently identify and mitigate the risks associated with the Model's development, testing, and change control procedures, the coding error operated undetected for more than two years.

### Respondents' Remedial Efforts

In determining to accept the Offers, the Commission considered remedial acts promptly undertaken by Respondents and cooperation afforded the Commission staff.

### Undertakings

Respondent has undertaken as follows:

33.     Compensatory Payment to Clients and Self-Administered Distribution

   a.     ARG has retained Cornerstone Research, Inc. ("Cornerstone"), an independent economic and financial analysis firm, to assess the coding error's impact on

9

clients. Cornerstone developed a methodology not unacceptable to the Commission staff that (i) estimated the potential greater exposure to common factor risk components for each month that a client account was impacted by the coding error; (ii) estimated the aggregate (across each of the affected factors) return implication of the potential greater exposure within each month and applied that return implication to an estimate of the monies invested in each portfolio in each client account within the month; and (iii) assumed that this estimated monthly impact would be reinvested back into the client's account to derive an estimate of that account's corrected return performance through the end of the account's error period. Using this methodology, Cornerstone determined that the error resulted in approximately $216,806,864 in losses across 608 client portfolios.

       b.     Respondents have undertaken to make, within 60 days of the date of entry of this Order, a payment, jointly and severally, in the amount of $216,806,864 to compensate ARIM and Affiliated Adviser clients for the harm caused by the conduct set forth in this Order (the "Compensatory Payment").

       c.     Respondents shall be responsible for self administering the distribution of the Compensatory Payment. Respondents shall:

          i.     deposit the Compensatory Payment into escrow accounts within 20 days of the date of entry of the Order;

          ii.     submit to the Commission staff a plan of allocation developed by Cornerstone that identifies (1) each ARIM and Affiliated Adviser client that will receive a portion of the Compensatory Payment, (2) the exact amount of that payment as to each client, and (3) the methodology used to determine the exact amount of that payment as to each client, within 30 days after the date of entry of the Order; and

          iii.     complete transmission of the Compensatory Payment to all affected ARIM and Affiliated Adviser clients pursuant to the plan of allocation within 60 days after the date of entry of the Order.

       d.     Any amounts remaining after distribution, and any amounts Respondents are unable, due to factors beyond their control, to pay to any affected client, shall be transferred to the Securities and Exchange Commission when the final accounting is submitted and shall be (i) made by United States postal money order, certified check, bank cashier's check or bank money order; (ii) made payable to the Securities and Exchange Commission; (iii) hand-delivered or mailed to the Office of Financial Management, Securities and Exchange Commission, Operations Center, 6432 General Green Way, Stop 0-3, Alexandria, VA 22312; and (iv) submitted under cover letter that identifies that identifies ARG, ARIM and BRRC as Respondents in these proceedings, the file number of these proceedings, a copy of which cover letter and money order or check shall be sent to Bruce Karpati, Co-Chief of the Asset Management Unit, Division of Enforcement, Securities and Exchange Commission, New York Regional Office, 3 World Financial Center, Suite 400, New York, NY 10281.

   e. Respondents agree to be responsible for all tax compliance responsibilities associated with the Compensatory Payment and may retain any professional services necessary. The costs and expenses of any such professional services shall be borne by Respondents and shall not be paid out of the Compensatory Payment.

   f. Within 90 days after the date of entry of the Order, Respondents shall submit to the Commission staff for its approval a final accounting and certification of the disposition of the Compensatory Payment. The final accounting and certification shall include but not be limited to: (1) the amount paid to each payee, (2) the date of each payment, (3) the check number or other identifier of money transferred, (4) the date and amount of any returned payment, (5) a description of any effort to locate a prospective payee whose payment was returned, or to whom payment was not made due to factors beyond Respondents' control, (6) any amounts to be paid to the Commission pursuant to paragraph 33.d above with respect to any prospective payee whom Respondents were unable to pay due to factors beyond their control; and (7) an affirmation that the Compensatory Payment represents a fair and reasonable calculation of harm caused by the error prior to its correction in the Model. Any and all supporting documentation for the accounting and certification shall be provided to the Commission staff upon request. Respondents shall cooperate with reasonable requests for information in connection with the accounting and certification.

   g. After Respondents have submitted the final accounting to the Commission staff, the staff shall submit the final accounting to the Commission for approval and shall request Commission approval to send the remaining residual amount to the United States Treasury.

  34. <u>Oversight of BRRC.</u> ARG shall subject BRRC to all of its internal controls and compliance policies and procedures and include a provision that BRRC's Director shall report to ARG's Global CEO.

  35. <u>Global Compliance and Ethics Oversight Structure.</u> Through at least 2015 ARG shall maintain a global compliance and ethics oversight structure encompassing itself, BRRC, ARIM, and the Affiliated Advisers with the following attributes:

   a. ARG shall maintain a Global Compliance and Ethics Oversight Committee ("Global Compliance Committee") for all matters relating to its Code of Ethics, Escalation Policy, and compliance policies and procedures. The Global Compliance Committee shall be comprised of senior executives from ARG, BRRC, ARIM, and the Affiliated Advisers. The Global Compliance Committee shall hold quarterly meetings to review violations or potential violations of the Code of Ethics, Escalation Policy, and compliance policies and procedures and shall report all violations thereof to ARG's Global CEO and Board of Directors.

   b. ARG shall maintain a Compliance Controls Sub-Committee (the "Sub-Committee") within the Global Compliance Committee, chaired by ARG's Chief Compliance Officer and comprised of senior executives from ARG, ARIM, BRRC, and

the Affiliated Advisers. The Sub-Committee shall review compliance issues throughout the business of ARG, endeavor to develop solutions to those issues, and oversee the implementation of those solutions. The Sub-Committee shall provide reports on internal compliance matters to the Global Compliance Committee at least quarterly.

   c. ARG shall require its Chief Compliance Officer to report to ARG's Global CEO and Board of Directors any breach of fiduciary duty or any violation of a federal securities law of which the Chief Compliance Officer becomes aware in the course of carrying out his or her duties on at least a quarterly basis; provided, however, that any material breach (i.e., any breach that would be important, qualitatively or quantitatively, to a reasonable client) shall be reported immediately.

   d. ARG shall maintain a reporting system whereby its employees or the employees of BRRC, ARIM, and the Affiliated Advisers can report, on an anonymous basis, directly to the Global Compliance Committee, any breaches of fiduciary duty or violations or potential violations of ARG's Code of Ethics, Escalation Policy, compliance policies and procedures, or of the federal securities laws.

  36. <u>Independent Compliance Consultant.</u>

   a. ARG shall retain, within 30 days of the date of entry of this Order, the services of an Independent Compliance Consultant not unacceptable to the staff of the Commission and a majority of ARG's Board of Directors. ARG shall ensure that the Independent Compliance Consultant has experience and expertise in quantitative investment techniques (or the Independent Compliance Consultant can contract to obtain such experience or expertise), including, but not limited to, the control and auditing environments applicable to quantitative investment computer programs such as the Model. The Independent Compliance Consultant's compensation and expenses shall be borne exclusively by ARG. ARG shall require the Independent Compliance Consultant to conduct a comprehensive review of ARG's, BRRC's, ARIM's, and the Affiliated Advisers' supervisory, compliance, and other policies and procedures designed to detect and prevent breaches of fiduciary duty, breaches of ARG's Code of Ethics or violations of the federal securities laws by ARG, BRRC, ARIM, the Affiliated Advisers and their employees. This review shall include, but shall not be limited to, the following:

    (i) <u>Disclosure.</u> The Independent Compliance Consultant will review ARG's, BRRC's, ARIM's, and the Affiliated Advisers' disclosures about the coding process, identify any weaknesses in that process, and make recommendations as to the appropriate disclosures relating to the coding of the Model to investors.

    (ii) <u>Reporting.</u> The Independent Compliance Consultant will review BRRC's reporting of errors or other issues that arise after changes to the Model go into production, and make appropriate recommendations as to the inclusion of compliance personnel, policies, and procedures into that reporting process.

12

        (iii)   <u>Recordkeeping.</u>  The Independent Compliance Consultant will review BRRC's approach to documenting errors in the Model, the retention of versions of the computer code that animate the Model, and make appropriate recommendations as to how to document and retain changes that occur in the code.

    ARG shall cooperate fully with the Independent Compliance Consultant and shall provide the Independent Compliance Consultant with access to files, books, records, and personnel as reasonably requested for the review.

    b.   ARG shall require that, at the conclusion of the review, which in no event shall be more than 180 days after the date of entry of this Order, the Independent Compliance Consultant shall submit a Report to ARG and the staff of the Commission. The Report shall address the issues described in paragraph 36.a above, and shall include a description of the review performed, the conclusions reached, the Independent Compliance Consultant's recommendations for changes in or improvements to policies and procedures for ARG, BRRC, ARIM, and the Affiliated Advisers, and a procedure for implementing the recommended changes in or improvements to those policies and procedures.

    c.   ARG, BRRC, ARIM, and the Affiliated Advisers shall adopt all recommendations contained in the Report of the Independent Compliance Consultant; provided, however, that, within 210 days after the date of entry of this Order, ARG, BRRC, ARIM and the Affiliated Advisers shall, in writing, advise the Independent Compliance Consultant and the staff of the Commission of any recommendations that one or more of them considers to be unnecessary or inappropriate. With respect to any such recommendation, ARG, BRRC, ARIM and the Affiliated Advisers need not adopt that recommendation at that time but shall propose, in writing, an alternative policy, procedure or system designed to achieve the same objective or purpose.

    d.   As to any recommendation with respect to the policies and procedures of ARG, BRRC, ARIM, and/or the Affiliated Advisers on which one or more of them and the Independent Compliance Consultant do not agree, such parties shall attempt in good faith to reach an agreement within 240 days of the date of entry of this Order.  In the event ARG, BRRC ARIM and/or the Affiliated Advisers and the Independent Compliance Consultant are unable to agree on an alternative proposal, ARG, BRRC, ARIM and the Affiliated Advisers shall abide by the determinations of the Independent Compliance Consultant.

    e.   ARG, ARIM, BRRC, and the Affiliated Advisers shall conduct compliance training for all of their employees no later than 300 days after the date of entry of this Order or 90 days following adoption by ARG, BRRC, ARIM, and the Affiliated Advisers of all recommendations contained in the Report of the Independent Compliance Consultant.

    f.   ARG shall not terminate the Independent Compliance Consultant without the prior written approval of the majority of ARG's Board of Directors and the

13

staff of the Commission.  ARG shall compensate the Independent Compliance Consultant for services rendered pursuant to this Order at its reasonable and customary rates.  Neither ARG nor any of its affiliates shall be in or have an attorney-client relationship with the Independent Compliance Consultant and neither ARG nor its affiliates shall seek to invoke the attorney-client or any other doctrine or privilege to prevent the Independent Compliance Consultant from transmitting any information, reports, or documents to the staff of the Commission.

    g. ARG shall require that the Independent Compliance Consultant, for the period of the engagement and for a period of two years from completion of the engagement, shall not enter into any employment, consultant, attorney-client, auditing or other professional relationship with ARG or any of its present or former affiliates, directors, officers, employees, or agents acting in their capacity as such.  ARG shall require that any firm with which the Independent Compliance Consultant is affiliated in the performance of his, her or its duties under this Order shall not, without prior written consent of the staff of the Commission, enter into any employment, consultant, attorney-client, auditing or other professional relationship with ARG or any of its present or former affiliates, directors, officers, employees, or agents acting in their capacity as such for the period of the engagement and for a period of two years after the engagement.

  37. <u>Periodic Compliance Review.</u>  At the end of ARG's fiscal years 2012 and 2013, ARG, BRRC, ARIM and the Affiliated Advisers shall undergo a compliance review by the Independent Compliance Consultant.  At the conclusion of the review, the Independent Compliance Consultant shall issue a report of its findings and recommendations concerning the supervisory, compliance, and other policies and procedures at ARG, BRRC, ARIM and the Affiliated Advisers designed to prevent and detect breaches of fiduciary duty, breaches of the Code of Ethics and federal securities law violations by ARG, BRRC, ARIM, the Affiliated Advisers, and their employees.  Each report shall be promptly delivered to ARG's Board of Directors and the Global Compliance Committee.

  38. <u>Certification.</u>  Respondents shall certify, in writing, compliance with the undertakings set forth above.  The certification shall identify the undertakings, provide written evidence of compliance in the form of a narrative, and be supported by exhibits sufficient to demonstrate compliance.  The Commission staff may make reasonable requests for further evidence of compliance, and Respondents agree to provide such evidence.  The certification and supporting material shall be submitted to the Assistant Regional Director for the Asset Management Unit, Los Angeles Regional Office, Securities and Exchange Commission, 5670 Wilshire Boulevard, Los Angeles, California, 90036, with a copy to the Office of Chief Counsel of the Enforcement Division, no later than sixty (60) days from the date of the completion of the undertakings.

  39. <u>Recordkeeping.</u>  Respondents shall preserve for a period not less than six years from the end of the fiscal year last used, the first two years in an easily accessible place, any record of their compliance with the undertakings set forth above.

40.     Deadlines.  The staff of the Commission may extend any of the procedural dates set forth above for good cause shown.

41.     Ongoing Cooperation.  Respondents shall cooperate fully with the Commission in any and all investigations, litigations or other proceedings relating to or arising from the matters described in the Order.  In connection with such cooperation, Respondents shall:

a.      Produce, without service of a notice or subpoena, any and all non-privileged documents and other information requested by the Commission staff subject to any restrictions under the law of any foreign jurisdiction;

b.      Use their best efforts to cause their officers, employees, and directors to be interviewed by the Commission staff at such time as the staff reasonably may direct;

c.      Use their best efforts to cause their officers, employees, and directors to appear and testify without service of a notice or subpoena in such investigations, depositions, hearings or trials as may be requested by the Commission staff; and

d.      In connection with any testimony of Respondents' officers, employees, and directors to be conducted at deposition, hearing, or trial pursuant to a notice or subpoena, Respondents:

(i)     Agree that any such notice or subpoena for Respondents' officers', employees', and directors' appearance and testimony may be served by regular or electronic mail on:  Fred W. Reinke, Esq., Mayer Brown LLP, 1999 K Street, N.W., Washington, DC  20006-1101; freinke@mayerbrown.com or Lee H. Rubin, Esq., Mayer Brown LLP, Two Palo Alto Square, Suite 300, Palo Alto, CA  94306; lrubin@mayerbrown.com.

(ii)    Agree that any such notice or subpoena for Respondents' officers', employees', and directors' appearance and testimony in any action pending in a United States District Court may be served, and may require testimony, beyond the territorial limits imposed by the Federal Rules of Civil Procedure.

## IV.

In view of the foregoing, the Commission deems it appropriate and in the public interest to impose the sanctions agreed to in Respondents' Offers.

Accordingly, pursuant to Section 8A of the Securities Act, Section 9(b) of the Investment Company Act and Sections 203(e), 203(f), and 203(k) of the Advisers Act, it is hereby ORDERED that:

    A.    Respondent ARG cease and desist from committing or causing any violations and any future violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act.

    B.    Respondent ARIM cease and desist from committing or causing any violations and any future violations of Section 206(2) of the Advisers Act.

    C.    Respondent BRRC cease and desist from committing or causing any violations and any future violations of Sections 206(2) and 206(4) of the Advisers Act and Rule 206(4)-7 thereunder.

    D.    Respondents ARG, ARIM, and BRRC are censured.

    E.    Respondents shall, jointly and severally, within ten (10) days of the entry of this Order, pay a civil money penalty in the amount of $25 million to the United States Treasury.  If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. 3717.  Such payment shall be: (A) made by wire transfer, United States postal money order, certified check, bank cashier's check or bank money order; (B) made payable to the Securities and Exchange Commission; (C) hand-delivered or mailed to the Office of Financial Management, Securities and Exchange Commission, Operations Center, 6432 General Green Way, Stop 0-3, Alexandria, VA 22312; and (D) submitted under cover letter that identifies ARG, ARIM and BRRC as Respondents in these proceedings, the file number of these proceedings, a copy of which cover letter and money order or check shall be sent to Bruce Karpati, Co-Chief of the Asset Management Unit, Division of Enforcement, Securities and Exchange Commission, New York Regional Office, 3 World Financial Center, Suite 400, New York, NY 10281.

    F.    Respondents shall comply with the undertakings enumerated in Paragraphs 34 to 40 above.

    By the Commission.

    Elizabeth M. Murphy
    Secretary

16

Service List

      Rule 141 of the Commission's Rules of Practice provides that the Secretary, or another duly authorized officer of the Commission, shall serve a copy of the Order Instituting Administrative and Cease-and-Desist Proceedings, Pursuant to Section 8A of the Securities Act, Section 9(b) of the Investment Company Act of 1940, and Sections 203(e), 203(f), and 203(k) of the Investment Advisers Act of 1940, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order ("Order"), on the Respondents and their legal agent.

      The attached Order has been sent to the following parties and other persons entitled to notice:

Honorable Brenda P. Murray
Chief Administrative Law Judge
Securities and Exchange Commission
100 F Street, N.E.
Washington, DC  20549-2557

Jason P. Lee, Esq.
Los Angeles Regional Office
Securities and Exchange Commission
5670 Wilshire Blvd., Suite 1100
Los Angeles, CA  90036

AXA Rosenberg Group LLC
c/o Fred Reinke, Esq.
Mayer Brown LLP
1999 K Street, N.W.
Washington, DC  20006-1101

AXA Rosenberg Investment Management LLC
Fred Reinke, Esq.
Mayer Brown LLP
1999 K Street, N.W.
Washington, DC  20006-1101

Barr Rosenberg Research Center LLC
Fred Reinke, Esq.
Mayer Brown LLP
1999 K Street, N.W.
Washington, DC  20006-1101

Fred Reinke, Esq.
Mayer Brown LLP
1999 K Street, N.W.
Washington, DC  20006-1101
(Counsel for AXA Rosenberg Group LLC, AXA Rosenberg Investment Management LLC, and Barr Rosenberg Research Center LLC)

Lee Rubin, Esq.
Mayer Brown LLP
2 Palo Alto Square, Suite 300
3000 El Camino Real
Palo Alto, CA  94306
(Counsel for AXA Rosenberg Group LLC, AXA Rosenberg Investment Management LLC, and Barr Rosenberg Research Center LLC)